PARAGON ENERGY CORPORATION, Plaintiff,

v.

WILLIAMS & DAVIS BOILER & WELDING CO., INC., Defendant and Cross-Claim Plaintiff,

v.

FIREMAN'S FUND INSURANCE COMPANY, Cross-Claim Defendant.

No. 80-1035-CV-W-7-1.

United States District Court, W.D. Missouri, W.D.

Oct. 22, 1982.

**814**

Dan Dibble, Kansas City, Mo., for plaintiff.

David R. Frensley, Kansas City, Mo., for defendant and cross-claim plaintiff.

JOHN W. OLIVER, Senior District Judge.

## I.

The above case was commenced in the Circuit Court of Jackson County, Missouri by Paragon Energy Corporation (Paragon), the prime contractor for the construction and modification of a new heating plant in a Veterans Administration hospital at Muskogee, Oklahoma, against Williams & Davis Boiler, Inc., (Davis Boiler), one of its subcontractors on that construction project. The case was promptly removed to this Court. Davis Boiler filed a Miller Act cross-claim against Paragon, joining Fireman's Fund Insurance Company, (Fireman) the surety on the Miller Act Bond, as an additional cross-claim defendant. Under procedures followed by the parties in this Court which need not be stated in detail, it is apparent that this case was reduced to and was tried as a typical Miller Act action by a subcontractor against the prime contractor and its surety on a Miller Act Bond.

Shortly before a jury-waived trial, the parties agreed upon a joint stipulation of facts. The area of factual dispute was, for the most part, eliminated by counsels' commendable cooperation with the Court in regard to admissions made in regard to findings of fact which were proposed in accordance with the requirements of Standard Pretrial Order No. 4 of this Court. Davis Boiler, the subcontractor, proposed sixty separate findings of fact. Paragon admitted the vast majority of Davis Boiler's proposed findings.

The record further shows that the parties rely in large part on the same documentary evidence, disagreeing, of course, in regard to what inferences should be drawn in regard to that evidence. While there was some conflict in the testimony of the witnesses, the record establishes that neither Paragon nor Davis Boiler had any substantial experience in the execution of standard government contracts and that most of their difficulties arose from that fact and from the role that Whitney M. Kerr Company (Kerr) played in inducing Davis Boiler to furnish material and labor to the construction project.

We shall adopt the findings proposed by Davis Boiler which are admitted by Paragon and make additional findings to cover material questions of fact which were not mentioned in any of the findings proposed by any of the parties.

Our independent findings will carry the same paragraph number as an admitted finding, except that we will add letters of the alphabet to that number to designate our independent finding. For example, paragraph 7 will reflect a fact proposed by Davis Boiler which has been admitted by Paragon and Fireman. Paragraphs 7(a), 7(b), and 7(c) will reflect independent findings made by the Court.

## II. *Findings of Fact*

1. During 1976 and thereafter, Paragon was a contractor for the construction and modification of a new heating plant in a hospital operated by the Veterans Administration (V.A.) at Muskogee, Oklahoma (the construction project).

2. Paragon's bid for the construction project was accepted by the V.A. on June 15, 1976. Paragon contracted with the V.A. to complete the construction project for $747,000.00.

3. As required by 40 U.S.C. § 270a (the Miller Act), Paragon as principal and Fireman's Fund Insurance Company as surety executed a standard government form of payment bond.

4. In accordance with the payment bond, Paragon and Fireman bound themselves jointly and severally in the sum of $373,000.00, conditioned upon Paragon's making payment to all persons supplying labor and materials in the prosecution of the work for the construction project.

5. Paragon was notified by the V.A. to proceed with the project on June 30, 1976. Work was to be completed within 730 calendar days from the date of the receipt of the letter notifying Paragon of the notice to proceed.

6. Sometime prior to July 7, 1976, Whitney M. Kerr Company was furnished with an incomplete set of the V.A. project specifications for the boiler-burner units.

7. On July 7, 1976, Kerr submitted a quotation to Paragon for the furnishing of three (3) standard design 300 horsepower boiler-burner units; the quotation provided that the payment terms were "one percent ten days—net thirty." The quotation also provided that "prices firm for 30 days; subject to review thereafter." By such quotation, Kerr offered to provide three (3) standard design Williams & Davis boilers for $82,071.00 (inclusive of certain spare parts). Kerr's July 7, 1976 quotation took exception to certain of the V.A. boiler specifications for the project.

7(a). Kerr's July 7, 1976 quotation to Paragon was introduced in evidence as Plaintiff's Exhibit No. 4 and Defendant's Exhibit No. 5.

7(b). Confusion between the parties was introduced at the outset by the fact that Kerr was attempting to act on behalf of Davis Boiler. The large number of "exceptions" stated by Kerr in the quotation submitted to Paragon almost ensured future difficulty in regard to compliance with the specifications of the prime government contract.

7(c). Kerr, for example, stated in Exception No. 5 that "we do not see the necessity in furnishing complete shop drawings since you have ordered an ASME boiler, Section I with National Board stamping and registration. It will be supplied in complete accordance with, or exceeding, this Code. All engineering designs, calculations, etc., have been approved by the ASME Boiler Code."

7(d). Subsequent undisputed facts establish that substantial difficulty was encountered in regard to the furnishing and approval of shop drawings which were, of course, insisted upon by the Veterans Administration in accordance with the prime contract.

8. On August 20, 1976, Paragon issued its purchase order No. 875–2 to Davis Boiler for three (3) Williams & Davis boiler-burner units for a total price of $82,071.00. The purchase order did not incorporate Kerr's exceptions to the V.A. project specifications which were set out in its July 7, 1976 quotation.

8(a). Paragon's purchase order No. 875–2 was introduced as Plaintiff's Exhibit No. 5 and as Defendant's Exhibit No. 8. The second page of that purchase order directed attention to the "Samples and Shop Drawings" paragraphs contained in Paragon's prime contract with the Veterans Administration, all of which were expressly incorporated in the purchase order, and also stated that "this order becomes valid upon receipt of signed copy in our office."

8(b). Plaintiff's Exhibit No. 6, Kerr's August 23, 1976 letter to Davis Boiler which transmitted Paragon's purchase order No. 875–2 to Davis Boiler noted the various "differences between the specifications and what we have offered" and cautioned Davis Boiler that "three items on the customer's purchase order ... should be cleared up prior to acceptance of the order."

9. Davis Boiler refused to acknowledge (accept) Paragon's purchase order No. 875–2 as written since the exceptions to the boiler specifications set out in Kerr's quotation of July 7, 1976 to Paragon had not been incorporated in such purchase order, and as such purchase order stated "this order is for equipment and/or materials, all as set forth here-in in strict accordance with the engineering drawings and specifications as prepared by V.A. hospital, including but not limited to the sections, articles and paragraphs referred to here-in-after."

10. On September 8, 1976, Paragon made its second request of Davis Boiler for the acknowledgment and return of its purchase order No. 875–2.

10(a). Defendant's Exhibit 20 establishes that Paragon made at least six routine requests for Davis Boiler to "sign and return copy of purchase order." Each of those requests reflected Paragon's recognition that a valid purchase order contract had not been agreed to by the parties.

11. On October 12, 1976, John C. Davis, Davis Boiler, corresponded with Ron Pile of Paragon and informed him that Davis Boiler had delayed acknowledging the purchase order because of several discrepancies in the purchase order from Kerr's July 7, 1976 quotation. In that letter Davis pointed out various exceptions Davis Boiler would make as to the specifications as written for the project and indicated that in view of them, Davis Boiler would appreciate Paragon's issuing a revised purchase order reflecting those exceptions and those of Peabody/Gordon-Piatt to the specifications relating to the burner units for the boilers.

12. On October 18, 1976 Paragon informed Davis Boiler that Paragon's purchase order No. 875–2 was based on acceptance by the V.A. of the boilers called for in the purchase order; if approval was not obtained, a cancellation of purchase would be issued.

13. On October 21, 1976, Davis Boiler submitted its proposal No. 875–2/8–20–76 to Paragon for three (3) boilers for the construction project. This proposal contained those exceptions to the boiler specifications set out in John Davis' October 12, 1976 letter set out in paragraph 11 above.

14. The above proposal was not acknowledged (accepted) by Paragon. [Paragon denied the finding we have made in this Paragraph. That denial is untenable because Davis Boiler's Proposed Finding No. 14 simply repeated Paragraph 14 of the joint stipulation of facts executed by the parties immediately before trial. Indeed, the findings made in paragraphs 11 through 13, inclusive, all of which were admitted by Paragon, are directly quoted from the same joint stipulation of facts.]

15. On November 3, 1976 Paragon made its sixth request to Davis Boiler to sign and return the acknowledgment copy of purchase order No. 875–2.

16(a). On November 19, 1976 Davis Boiler executed Paragon's purchase order No. 875–2 with the express condition that "This order is accepted with the stipulation that exceptions to specifications as listed in our letter of 10/12/76 to Mr. Ron Pile, and as listed on proposal No. 875–2/8–20–76 dated 10/21/76 be acknowledged and accepted as a part of this order. Copy of proposal attached." [We have modified the agreed finding of fact in order to quote the note added by Davis Boiler in full.]

17(a). Davis Boiler's October 12, 1976 letter to Paragon, Plaintiff's Exhibit No. 7 and Defendant's Exhibit No. 14, to which reference was made in the note added by Davis Boiler on Paragon's purchase order No. 875–2, shows on its face that Davis Boiler had many "exceptions" to the specifications set forth in the prime contract in Paragon's proposed purchase order. That letter expressly stated that "[i]n view of the above exceptions to the specifications and those shown on your purchase order, we would appreciate very much your issuing a revised purchase order [which] will replace your original order."

17(b). Davis Boiler, by its addition of its note on Paragon's purchase order No. 875–2, was attempting to get Paragon to issue a revised purchase order which would expressly accept and incorporate therein the exceptions stated in Mr. Pile's October 12, 1976 letter to Paragon.

17(c). There is no evidence in the record to support a finding that Paragon ever accepted the exceptions stated in Mr. Pile's letter of October 12, 1976. Indeed, there is no evidence in the record to support a finding that Paragon ever believed that its purchase order No. 875–2 had been unconditionally accepted by Davis Boiler.

17(d). Paragon, in spite of the fact it had not yet been able to obtain an unconditional acceptance of its purchase order No.

875–2 from Davis Boiler, nevertheless presented submittal and shop drawings to the Veterans Administration for its approval, as required by the prime contract.

17(e). On November 19, 1976 the Chief of the Heating and Steam Generation Division of the Veterans Administration Central Office in Washington, D.C., advised the Contracting Officer on the project that "the boiler submittal is not sufficiently organized to follow" and that "the brochure is not indexed and items of equipment are not identified with the specifications." Plaintiff's Exhibit No. 11. That letter concluded with the following statement:

> Please advise Paragon Mechanical Inc. that we can not continue to review shop drawings submitted in this manner and that we insist that section 700–7, submittals and shop drawings of the specifications be complied with.

17(f). The Contracting Officer on the project forwarded a copy of that letter to Paragon on December 2, 1976, see Plaintiff's Exhibit 13, and advised Paragon that "Section 700–7, Submittals and Shop Drawings, must be adhered to *strictly*."

17(g). Plaintiff's Exhibits No. 15 and No. 16 show that in February of 1977 Paragon continued to experience difficulty in obtaining approval of its Boiler Submittal to the Veterans Administration. Those exhibits further show that Paragon assumed that Whitney Kerr was somehow the responsible person to contact and to "keep after Davis Boiler in regard to Paragon's required resubmittal." (Plaintiff's Exhibit No. 15). Davis Boiler's letter of February 4, 1977 to Peabody-Gordon & Piatt, Inc., shows that still another party was involved in assembling material for Paragon's resubmittal to the Veterans Administration. The closing paragraph of that letter addressed to Peabody-Gordon & Piatt, Inc. (Plaintiff's Exhibit No. 16) stated:

> We have most of our material ready to resubmit, and would appreciate very much anything you can do to send us your part. I hate to put you to this trouble as we know how busy you are, but either Whitney Kerr or Paragon Mechanical phones me at least once a week saying "hurry." Whitney Kerr is bound and determined to get this job.

The obvious confusion in regard to who was going "to get this job," as reflected by the last sentence of the concluding paragraph of Davis Boiler's February 4, 1977 letter, is but a reflection of the general confusion experienced by all the parties in their efforts to comply with the terms and conditions of a standard government contract. That circumstance, of course, does not affect the liability of Paragon and Fireman under the Miller Act.

18. On December 27, 1976 Gary G. Hardin of Paragon requested an indeterminate extension of time of Doyle Stiles, Contracting Officer, V.A. Hospital, to complete the project because of the mishandling of shop drawings, including the boiler submittal, by the V.A. Central Office.

19(a). On May 9, 1977 J.E. Davis of Davis Boiler wrote Bob Jefferis of Kerr, and stated the following:

> Dear Bob:
>
> It has been quite some period of time since we have heard anything from you or Paragon regarding the subject job, and we would appreciate your advising us if any progress is being made toward finalizing this particular project.
>
> During the past year, we have incurred numerous increases from our suppliers, as well as increased labor costs, and have no alternative but to initiate an escalation charge of 1% per month on this particular job, effective January 1, 1977, until date of shipment.
>
> As you are aware, all quotations are valid for 30 days from date of the quotation, and subject to negotiation thereafter. We are trying to be fair with you and your customer in this matter, but we cannot hold the prices quoted for an unlimited time due to the above mentioned cost increases incurred by W & D, which I am sure you can understand.
>
> We feel that Paragon, as well as the Veterans Administration, should be made aware of this escalation charge, and if

you should have any questions please do not hesitate to let us know.

19(b). Davis Boiler's May 9, 1977 letter to Kerr again reflects its general confusion in regard to the relationship of the parties. For example, Davis Boiler stated to Kerr, who was not in formal contractual relationship with anyone, that it was trying to be "fair with you and *your* customer in this matter" in regard to Davis Boiler's expressed intention "to initiate an escalation charge of 1% per month on this particular job, effective January 1, 1977, until date of shipment." For further example, it is indeed difficult to understand why Davis Boiler did not write directly to Paragon, rather than to Kerr, in order to make Paragon "aware of this escalation charge."

So far as Miller Act liability is concerned, Davis Boiler's May 9, 1977 letter to Kerr, can be said only to reflect Davis Boiler's intent to insist upon an escalation of its quoted price, if and when it might reach a firm agreement with Paragon to supply labor and material to the project.

19(c). On June 15, 1977, the new Contracting Officer on the project advised Paragon as follows (Plaintiff's Exhibit No. 18):

I am not satisfied with the progress being made on our contract V623C–461, dated June 25, 1976, for Boiler Plant Expansion. The construction progress chart, VA Form 08–6159, approved in August, 1976, indicated that this contract should be approximately 64% complete as of this date. In fact, the contract is about .7% complete as evidenced by the only progress payment of $5,000.00 approved on March 10, 1977.

It is my determination that this lack of progress is due to the unusually long period of time required by your office to obtain approval on the submittals required by Section S of the contract specifications. I have further determined that the time involved is unreasonable and is primarily your fault. My determination is based on the many submittals that have been incomplete in their original form or simply have not complied with the various sections of the specifications. . . .

Therefore, in view of the present situation, you are hereby requested to promptly review and resubmit any submittals currently on file as disapproved, and to expedite the submission of any remaining submittals.

I plan to review your progress on this contract again on or about August 15, 1977. If your progress has not substantially changed, I will be forced to declare you in default, terminate the contract and bill you for any additional cost incurred, all this in accordance with paragraph # 5 of the General Provisions VA Form 08–3374.

20. On May 31, 1977 John C. Davis advised Kerr that compliance with the V.A. requirements for extras not included in Kerr's original quotation would require a cost of $820.00 net on each unit, not including the addition of a davited back door for $432.20 on each boiler. Davis also reminded Kerr not to "forget the escalation charge as per our letter of May 9."

21(a). On June 27, 1977 Paragon responded to the Contracting Officer's June 15, 1977 letter and stated that Paragon's inability to start work was attributable to the gross mishandling and even loss of shop drawings in connection with submittals made to the V.A. Paragon complained that the most serious delaying factor was the lack of approval on the fuel oil tank (to be provided by a supplier other than Davis Boiler). Paragon, in this letter, again requested an extension of time to complete the project. Paragon stated that "We also intend to request reimbursement for any increased material or labor cost resulting from this delay."

21(b). The record shows that Paragon eventually was given some extension of time to complete the project. There is no evidence in the record, however, that Paragon ever attempted "to request reimbursement for any increased material or labor cost resulting from the delay" in the completion of the project, as it stated it would in its June 27, 1977 letter to the Contracting Officer.

22. In his July 29, 1977 letter to Robert F. Thomas of Paragon, Timothy Dacy, Contracting Officer of the V.A., Muskogee, Oklahoma, acknowledged that the V.A. may have caused delays through mishandling of some submittals for the construction project. Dacy further advised that the V.A. was changing the shipping address for submittals to the Resident Engineer in Muskogee instead of the V.A. Central Office (V.A.C.O.) in Washington, D.C. Dacy stated this new submittal procedure would probably cause further delays, but indicated that he was prepared to negotiate a time extension mutually acceptable to Paragon and the V.A.

23(a). Don Vaughan of Paragon telephoned J.E. Davis of Davis Boiler on August 9, 1977. See page 3 of Defendant's Exhibit No. 45.

23(b). On August 10, 1977 J.E. Davis of Davis Boiler, for reasons that are not apparent, again wrote Whitney Kerr the following letter (Plaintiff's Exhibit No. 23):

Dear Whitney:

Mr. Don Vaughan of Paragon Mechanical Contractors called to inform us that the government has not accepted the submittal data supplied for this job. He could not advise us the reason this was turned down but requested that we assemble new data for this job.

Before proceeding further, we will appreciate your written approval. Paragon Mechanical Contractors is agreeable to an escalation clause, per our letter of May 9th. Additional charges will also be necessary to cover our expenditures for a third submittal.

Should you have questions concerning this, please contact the writer.

23(c). The comment in Davis Boiler's August 10, 1977 letter to Kerr to the effect that "Paragon Mechanical Contractors is agreeable to an escalation clause, as per our letter of May 9th," is, of course, meaningless. For it is clear that the reference to "our letter of May 9th" is a reference to the letter Davis Boiler wrote Kerr which is quoted in our paragraph 19(a) of our findings.

It is again difficult to understand why Davis Boiler wanted Kerr's "written approval . . . before proceeding further." But, still again, Davis Boiler's obvious confusion in regard to the legal relationship of the various parties has no material impact on the eventual Miller Act liability of Paragon and Fireman.

23(d). On August 10, 1977, the same day Davis Boiler wrote its letter to Kerr, Paragon wrote Davis Boiler a letter (Plaintiff's Exhibit No. 24), which responded to a July 12, 1977 letter Paragon had received from Davis Boiler in which Davis Boiler advised that it would do its "utmost to expedite the shipment of these units as soon as we have received the approval, however, we would like to point out that at the present time we are running 4–5 months delivery on our current production."

23(e). Paragon's August 10, 1977 response to Davis Boiler's July 12, 1977 letter stated:

This is to acknowledge receipt of your letter regarding delivery schedules, dated July 12, 1977.

Subsequent events following that letter have made your answer even more unacceptable than at its receipt. As you know, the VA is once again going to disapprove the boiler submittal. This is our third submittal, with the first dating back to 9/28/76. I think all parties involved agree that four submittals to get the boilers approved is ridiculous.

Therefore, I wish to make the following points. One, this fourth submittal is of a critical nature. It *must* be approved. To assure this, we feel it is up to you to be sure the submittal is complete and coordinated with the others involved (i.e., Whitney Kerr Co., Peabody-Gordon-Piatt and the control manufacturer). The past three (3) submittals have shown a definite lack of coordination and this is the major reason that approval has not yet been secured.

Secondly, we again ask that we be given top priority in your production schedule. We find it impossible to live with a 4–5

month delivery schedule, especially in view of the fact that we need to resubmit again. The fact that the first boiler submittal went to the VA almost a year ago and that it has yet to be approved has put us unbelievably behind in our project schedule. In view of this, please forward a more realistic shipping schedule.

24(a). On August 12, 1977 Robert F. Thomas of Paragon, somewhat inconsistent with the assessment of responsibility stated by Mr. Vaughan of Paragon in his letter of August 10, 1977 to Davis Boiler, wrote Timothy R. Dacy, Contracting Officer, V.A., and complained of the continued delay in the processing of, approval, and return of shop drawing submittals. Thomas stated in his letter to the Contracting Officer that:

We believe these delays are due to the direct fault of the government and will form the basis for future requests for time extensions as well as possible delay and impact damages.

24(b). The record does not show whether Paragon ever attempted to recover any "delay and impact damages" from the Veterans Administration in accordance with the provisions of the standard government contract. The record is clear, however, that Paragon never attempted to process any administrative claim under the contract for any added costs resulting from the belated acceptance of its purchase order by Davis Boiler and its subsequent acceptance of the escalation cost of $15,429.87 in purchase order No. 875–2(b).

24(c). On August 27, 1977 Kerr wrote Davis Boiler a letter (Plaintiff's Exhibit No. 26) which stated in part the following:

This will serve to confirm my phone conversation of Friday, in which I advised that we are cleared for production on the units for the VA Hospital in Muskogee, OK. I was there with Bob Thomas of Paragon on Thursday, and we met with the local Resident Engineer and Mr. Bruce P. Carter of the VA in Washington, DC. They gave us a provisional OK on both the boiler and burner, with a possible reservation on some small items in connection with the burner. However,

there is apparently nothing that would keep you from going ahead with the boiler and burner, full blast.

24(d). On September 1, 1977, Kerr wrote Paragon a letter (Plaintiff's Exhibit No. 27) which stated in part the following:

This will serve to confirm our phone conversation of August 30th, regarding the VA Hospital job in Muskogee, OK.... We do not as yet have a firm date for Boiler # 1, although W & D has assured me that they are now going as rapidly as possible to supply it. I have impressed them with the urgency of the first unit and advised them that your work would be stopped in 3–4 weeks unless the boiler is ready by that time.

25(a). By his letter of September 2, 1977, J.E. Davis advised Bob Jefferis of Kerr that:

We appreciate very much receiving your letter of August 27 in regards to the above subject job; it is good to know you have almost got the approval.

I would like to point out that these boilers are 200 psi design, and we do not carry the material in stock for this particular pressure. We therefore must order the material from the mill, and as you know this will take longer and we cannot comply with the request of Paragon. We will do our utmost to make delivery of the first boiler in December, with the second and third units shortly thereafter provided:

1. We receive the purchase order for the addition of the davits which is $431.20 per unit, as this was not quoted on the original quotation.

2. If we are to supply the additional valves, etc., per our letter of May 31, there would be an additional net charge of $820.00 per boiler, as we did not have the complete specifications at the time of the bid, and do not see where we should be penalized for equipment that was not figured in the original quotation.

3. We must have a price increase based on my letter of May 9, which was an escalation charge of 1%/month,

starting January 1, 1977, until date of shipment of each unit.

We do not see where this is unreasonable due to the fact that the delay of approval has been primarily caused by the government. The cost of our raw materials, controls, and labor has increased a considerable amount over this period of time, and we of course are absorbing a good portion of this additional cost.

Our boilers did increase by 10% effective January 1, 1977, and took an additional increase of 10% on July 1, 1977.

As soon as we have received confirmation from you or Paragon, in writing, plus approval from the government, then we will procede (sic) to order the material and place same in our standard production schedule without any preferential treatment toward production over and above our regular customers.

We will await your reply before proceding (sic) further with this particular order.

25(b). On September 9, 1977, Kerr, in apparent recognition that it might be getting in the middle in more ways than one, forwarded Davis Boiler's September 2, 1977 letter to Kerr and Kerr's September 9, 1977 response to that letter to Paragon with a vague statement that "any comments I might make to you regarding these letters are actually self evident, or will be when you read the letters." Kerr's September 9, 1977 letter to Davis Boiler, attached to Plaintiff's Exhibit No. 29, stated "This is in response to yours of September 2nd, regarding the VA Hospital, Muskogee, OK, job." That letter also stated:

Regarding paragraph # 3—price escalation, we have discussed this with you previously and there are several factors which affect this. These are:

1. Delay by the government in approval. While I must agree that the VA did not handle the approval in the most expeditious manner possible, I cannot agree that the fault for the delay is all at their doorstep. The first submittals were lacking in completeness and in organization, to the point where quite a bit of time was consumed by the VA in attempting to approve what was submitted. They returned a list of I believe 43 items which were either missing, incomplete or unacceptable to the specifications as published. Had the second submittal answered all of those items, and had it been organized in such a fashion that it could be followed, the approval would have been forthcoming, probably about February of 1977. However, the second and third submittals were still missing some of the equipment and were so disorganized that a great deal of additional time was required for the VA to find out that they could not be accepted. As late as July of this year, when I became personally involved in this job, no one had checked to determine that the modulating gas and oil valves clearly required in the specs were not included (a straight oversight on the part of Peabody Gordon-Piatt) and the master controller was not included, although it was requested in Whitney Kerr's original request to you for quotation and most definitely called for in the specifications.

2. You indicate that material price increases have occurred which would not have occurred had the units been submitted and approved last winter, when they should have been so approved. This does *not* include the burners, because as recently as yesterday, Bill Krusor of Peabody Gordon-Piatt informed me that they are still holding the price quoted to you sixteen months ago. He did inform me that they could not do so much longer, however. They do have another price increase of approximately 12% due to take effect the first of November.

3. Paragon has stated that there is no provision in the contract for an automatic price escalation. However, they will be glad to forward a letter from you to the VA, with an endorse-

ment, requesting additional compensation. This letter would need to state valid reasons for such additional compensation. It is my personal feeling that such a letter would be appropriate only after the units are approved by the VA and work is started on the boiler-burner units.

We feel that this job has arrived at the crisis status at this time and I thought this feeling had been conveyed to you in our previous conversations. Your comment that you will put this unit into production after you have received approval in writing from both Paragon and the VA and that it will be placed in your regular production schedule *without* any preferential treatment toward production is something that I find shocking. It is disheartening to us as your representatives that you have ordered the material for these 300 HP, 200 psig design units. We get the impression that you do not intend to fill the order.

Whitney and I have discussed this letter and the present situation at great length. Please note that we both believe that this could easily become a matter for a court of law with both the Williams & Davis Boiler & Welding Co. and the Whitney M. Kerr Co. named as defendants, should this job drag into a condition of non-compliance with the purchase order given W & D or less-than-proper compliance.

Will you please give us, or give Paragon with copy to us, the above requested listing of the additional items and costs referred to in your paragraph # 2, and advise us of a change in your attitude in relation to your paragraph # 3 as I have outlined above? Thank you.

25(c). On October 11, 1977, Davis Boiler again made clear in its letter of October 11, 1977 to Kerr (Plaintiff's Exhibit No. 32) that it was not going to proceed with Paragon's original purchase order No. 875–2 until and unless Paragon expressly accepted the conditions stated in the Note on that purchase order which we quoted in paragraph 16(a) of our findings of fact. That letter stated in part that:

I would further like to refer you to an acknowledgement to Paragon covering their Purchase Order under date of 11/19/76 by John C. Davis, in which he made a notation that the "order is accepted with the stipulation that exceptions to specifications as listed in our letter of 10/12/76 to Mr. Ron Pile, and as listed on our Proposal No. 875–2/8–20–76 dated 10/21/76, be acknowledged and accepted as a part of this order. Copy of proposal attached."

I would still need acceptance of this in writing from Paragon before we can start construction of the units or procede (sic) further with their order.

25(d). Kerr did not respond to Davis Boiler's October 11, 1977 letter until November 1, 1977. Kerr explained in that letter (Plaintiff's Exhibit No. 34) that "I must admit that your letter of October 11th arrived here when I was trying to get out of Kansas City to attend a bid opening in Topeka . . . and I did not take the time to read your letter carefully. This was an error on my part." Kerr concluded its November 1, 1977 letter to Davis with the following:

Other than the above gas pressure switch problem, both Whitney and I are ready to bow out of further negotiations and discussions on this deal, except we would be willing to attend any face-to-face conference which you might have in Kansas City. We would appreciate copies of correspondence relating to this job, as we are obviously still interested in it. However, as I said in the last paragraph of my letter to Paragon, we do not seem to be able to communicate for and between yourselves and Paragon Mechanical.

We have devoted a great deal of time, effort, telephone, travel and office expense in an endeavor to get this order approved and in production. We feel we are spinning our wheels and are not getting either W & D or Paragon off dead center on items which are months old. It seems to us that this order is at a standstill until Paragon commits themselves in writing to W & D for extra items not

included in the original quotation, and until W & D answers the remaining questions to the satisfaction of the VA.

25(e). In a "further reply to [Paragon's] letter of November 28 regarding the additional charges," Davis Boiler reiterated that it would not proceed without a "purchase order to cover these additional charges on these units" and also stated that, in addition to the agreed additional charges of $817.80 per boiler, there would be other additional charges that would increase the price of the boilers. That letter specifically stated that:

I would also like to point out that I anticipate an increase of the burner prices from Peabody-Gordon & Piatt, and will therefore be forwarding this to you and increase in the cost of these boilers and burners to the government for additional increase in the price of the total contract to correspond with the increase in cost since the original purchase order was issued to us, and we will expect your prompt attention upon receipt of this information by forwarding to the government for prompt approval and your purchase order to cover these additional charges on these units. [Plaintiff's Exhibit No. 37]

26. Prior to September 22, 1977, the V.A. lost several of the submittals for the construction project, including the boiler submittal.

27. In response to the above referenced loss of submittals, Paragon requested a time extension from the V.A. to complete the project due to the obvious mishandling of the submittals by the V.A.

28. Paragon did not request any change order which would have called for reimbursement for any increased material or labor costs which allegedly resulted from the delay.

29. By his letter of October 27, 1977 Don Vaughan of Paragon complained to Ken Hall, Resident Engineer, V.A., concerning delay in the processing and approval of shop drawings which he indicated would form the basis for future requests for time extension as well as possible delay or impact

damages. Williams & Davis' boiler submittal was listed as 27 days behind schedule.

30. By his letter of November 11, 1977 J.E. Davis informed Paragon that in order to proceed with its order, it would be necessary to receive a firm purchase order from that company covering the equipment to be supplied, with certain changes set out in the letter, and to add to the purchase order the cost of davits.

31. On November 28, 1977 Robert F. Thomas, by his letter to J.E. Davis, advised that once an itemized breakdown of labor and material costs of the $817.80 charge as requested in the September 9, 1977 Kerr letter was received, he would personally guarantee that Paragon would issue a formal change order to cover Davis Boiler's additional costs (as set out in John Davis' May 31, 1977 letter set out in paragraph 20 above).

31(a). Paragon's letter of January 16, 1978 to Davis Boiler (Plaintiff's Exhibit No. 39) stated in part that:

It is my wish now to conclude and resolve the remaining matters and problems which exist between yourself, Whitney Kerr Co., and Paragon, thus allowing me to issue a final change order as you requested in your 11 November 1977 letter and as I have agreed to do in my 28 November 1977 letter.

I have reviewed our entire file and offer the following comments for the review and response of all parties. I'm sure you realize that I am not privy to relationships between you, your representatives and suppliers as relates to exchange of information, liabilities, etc. I feel there has been a great deal of wrong doing in this matter to which we may all have been party, including and especially the VA. Unfortunately, I am unable to determine at the moment the sort of justification we would need to make them pay for any of it.

\* \* \* \* \* \*

The Whitney Kerr Co. have previously indicated they would not bear any of the additional cost you have requested. It

seems obvious to me that they apparently share a large portion of the blame. We quite frankly do not feel any of the fault is accountable to Paragon. We will definitely honor my previous verbal and written commitment to at least share in the resolution.

I would request that you review the facts as presented hereinbefore and advise what you feel is a fair and acceptable monetary solution along with the best firm shipping schedule which you have been able to determine at this time.

31(b). Kerr, to whom a copy of Paragon's January 16, 1978 letter had been sent, responded that "Whitney M. Kerr Co. letter dated November 1, 1977 addressed to you states our position . . . ." That letter, quoted in our finding of fact No. 25(d), did not state any particular position other than Kerr's desire to "bow out of further negotiations and discussion on this deal."

32(a). Davis Boiler responded to Paragon's January 16, 1978 letter in a letter to Paragon dated January 27, 1978 (Plaintiff's Exhibit No. 41). Davis Boiler first made clear that it did not consider the Contracting Officer's letter of December 29, 1977 (Plaintiff's Exhibit No. 38) as an approval of Paragon's most recent boiler submittal. It stated in that regard that:

> We have not received any submittal stamped "Approved" by the VA, or Paragon Mechanical, and do not consider this order released for production until this has been received in our office. We must have one submittal booklet with all equipment marked as "Approved." . . . When approval has been received, we will do our utmost to give you a firm shipping date, which will correspond as far as the vessel is concerned. We are not going to order the other items such as the burners, controls, etc. until we receive the stamped, approved submittal from the VA.

Davis Boiler reiterated its position in regard to Paragon's original purchase order No. 875–2 by stating that:

> We had received six (6) requests to sign and return copy of the purchase order, and it became evident that Paragon had no intention of issuing a revised purchase order, as we had requested, to include the exceptions taken to specifications. Therefore, we signed the acknowledgment copy with the notation that "This order is accepted with the stipulation that exceptions to specifications as listed in our letter of 10/12/76 to Mr. Ron Pile, and as listed on our Proposal # 875–2/8–20–76 dated 10/21/76 be acknowledged and accepted as a part of this order."

Davis Boiler added that:

> It is difficult for us to understand how Williams & Davis or Whitney Kerr Company can be held accountable for all the "lack of coordination" on this particular project, when neither firm had been furnished with a *complete* set of specifications stipulating the requirements of the VA. Neither Williams & Davis nor Whitney Kerr Company deals extensively in government contracts, nor are we totally familiar with federal requirements on a job such as this. Paragon Mechanical should have furnished the *complete* information to the supplier at the proper time, not after an extended period of time had elapsed.

Davis Boiler concluded its January 27, 1978 letter to Paragon with the following paragraphs:

> We have reviewed the facts, and we will expect to receive your purchase order for the davits, other equipment specified, or deducted, from Paragon Mechanical as we have outlined herein.
>
> We will also anticipate a percentage escalation increase of an additional amount for Paragon Mechanical to go to the VA to collect for Williams & Davis due to the time from the original order to delivery, and it seems now it will be delivered at a later time because we still have not received any approval in writing.

33. By its letter of February 1, 1978 Paragon requested a 210 day extension of time from the V.A. to complete the construction project because of time loss or delays and mishandling of submittals by the

V.A. up to August 5, 1977 when Paragon was finally able to begin work on the project.

34. On February 8, 1978 Paragon issued its purchase order No. 875–2(a) to Davis Boiler in the amount of $3,747.00, to cover "additional charges as requested in your (Davis Boiler's) letters of 2 September 1977 and 7 December 1977, as per our agreement letter of 28 November 1977 and our 8 February 1978 Telex."

35(a). The additional charges of $3,747.00 referred to in paragraph 34 above are not in controversy in this action.

36(a). The fact that Davis Boiler never formally accepted purchase order No. 875–2(a) does not place the $3,747.00 figure in dispute.

37(a). On February 21, 1978 Davis Boiler forwarded to Paragon its Proposal No. 875–2A and drawings. In its letter of transmittal (Plaintiff's Exhibit No. 46), Davis Boiler stated:

> Enclosed are three (3) copies of our Proposal No. 875–2A and drawings. This represents the final approval requirements for the VA Hospital job, as we have reconstructed the past year's paperwork. Please review this package to ensure we are both in accord with the requirements of the VA.
>
> We are now placing orders for this special material and request that you sign a copy of the proposal, and return it to us to be sure no further delays ensue. Please return this to us no later than February 28, 1978.
>
> As yet, we are not sure of price escalations, but we can work these out as they arise.
>
> If no delays are encountered in the receipt of the purchased material, you can anticipate delivery of the first unit the week of March 27, second unit the week of April 17, and third unit the week of May 8th.

The total purchase price quoted as $85,818.00. The last page of the proposal, consistent with the letter of transmittal, stated that the quoted figure was "Subject to potential price escalations."

37(b). The $85,818.00 quoted by Davis Boiler to Paragon is the sum of $82,071.00 stated in Paragon's original, but unaccepted purchase order, and $3,747.00, the additional charges to which the parties were then in agreement should be considered as additional costs.

37(c). Shortly after its receipt, Davis Boiler forwarded to Paragon a letter it had received from Peabody, Gordon-Piatt, dated February 15, 1978 (Defendant's Exhibit No. 81), which advised that it was increasing the price of burners being sold to Davis Boiler by 6%. Davis Boiler also advised Paragon (Defendant's Exhibit No. 82) that since it had made its original July 7, 1976 quotation, it "has had to increase their price lists by 7½% on January 1, 1977, 10% on July 1, 1977, and 8% on January 1, 1978, due to rising costs of steel, controls, labor, etc., required in manufacture."

38. On February 27, 1978, Robert F. Thomas of Paragon accepted Davis Boiler's proposal No. 875–2A. The proposal provided under Conditions of Sale that all prices are net cash, and payable 30 days from date of shipment, or one percent (1%) discount if paid within ten (10) days of shipment. The proposal offered to provide the boilers for $85,818.00 "subject to potential price escalations." Under the terms of the Conditions of Sale, the proposal stated "all past due accounts one and one-half percent interest was to be charged monthly." The proposal also provided "This proposal is subject to the terms and conditions of sale set forth on the reverse hereof and your signature on the 'accepted' line and the approval of an officer of Williams & Davis Boiler & Welding Company, Inc., will cause this proposal to become a contract between us." The proposal was approved by Davis Boiler's president, J.E. Davis on March 8, 1978.

39. On May 18, 1978 Davis Boiler notified Paragon by letter that its escalation cost would be $5,143.29 per boiler.

39(a). Davis Boiler's May 18, 1978 letter stated in part that:

> Pertaining to our price escalation clause, we have received invoices reflecting lat-

est prices from vendors, not to mention our other labor, material, etc. increases over the past two years. Our additional costs have amounted to $5,143.29/boiler. Please secure approval from the VA for this amount.

Please secure written VA approval on the Vogt Series 12111 gate valves per my letter of March 8, and Mr. Don Vaughan's verbal approval of 5/4/78.

The shipment of these boilers depends on immediate approval and receipt of your Purchase Order for $15,429.87.

39(b). Paragon acknowledged receipt of Davis Boiler's May 18, 1978 letter on May 22, 1978. See Plaintiff's Exhibit No. 50. In its May 22, 1978 letter to Davis Boiler, Paragon stated in part:

We will be happy to forward your escalation request to the VA and will support your efforts to the maximum. I believe the VA response to such a matter would fall within the provisions of the changes clause. The attached specification excerpts outline the procedures and data required. These provisions are included in the contract Specifications, therefore form a part of our contract. Suggest you pay particular note to breakdown and substantiation when you present the data. Please forward this data as quickly as possible in order to minimize any delay.

39(c). At the time Paragon wrote its May 22, 1978 letter to Davis Boiler it honestly, but erroneously, believed (see *United States v. Fryd Construction Corporation,* 423 F.2d 980 (5 Cir.1970), *cert. denied* 400 U.S. 820, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970), that Davis Boiler, a Miller Act subcontractor, had some sort of legal right to present a claim for Davis Boiler's increased costs directly to the Veterans Administration under the changes clause in the prime contract.

40(a). In its responding letter of June 8, 1978, Davis Boiler advised Paragon that the General Provisions and General Conditions of the Veterans Administration prime contract "did not form a part of our contract with you and are not a part of our Terms and Conditions." Plaintiff's Exhibit No. 51.

41(a). Davis Boiler's June 8, 1978 letter further advised Paragon that Davis Boiler was "not staffed to handle Government Specifications."

42(a). Davis Boiler's June 8, 1978 letter to Paragon also stated that:

We have just received word from Peabody-Gordon & Piatt that the back-ordered parts for all burners will not be shipped until June 23, 1978. This will further delay completion and shipment of boilers.

This does allow time to obtain additional monies from the VA so you can send us your purchase order (for all three units) for the additional $15,429.87.

43(a). On June 15, 1978 Paragon advised Davis Boiler that "Since we last communicated there has been a shifting of responsibilities within our organization and this order is now being handled by Don Vaughan." (Plaintiff's Exhibit No. 51).

43(b). On the same day, June 15, 1978, Paragon issued its purchase order No. 875–2(b) signed by Don Vaughan in the amount of $15,429.87. That purchase order stated "as required by your letter dated June 8, 1978, this purchase order is submitted to cover cost escalations." The purchase order was accepted by Davis Boiler on June 20, 1978. The following language is, however, typed on the purchase order to the left of the acknowledgment signature blank:

This order is accepted subject to Terms & Conditions of sales stated on the reverse side of page 5 of Proposal No. 875–2A dated February 21, 1978 by Williams & Davis.

The following language was printed on the purchase order above the signature line:

Your Purchase Order is Hereby Acknowledged and Accepted, including terms and conditions stated on the face and reverse side hereof.

The above language was modified by Davis Boiler as follows:

See note at left    Your Purchase Order is Hereby Acknowledged and Accepted, xxxxxxxxxxxxxxxxxxxxxxxxx-xxxxxxxxxxxxxxxxxxxxxxxxx-xxxxxxxxxxxxxxxxxxxxxxxxx-xx

44(a). Paragon, at the time it received Davis Boiler's acceptance of its purchase order No. 875–2B did not raise any question about Davis Boiler's modification of the printed terms and conditions language of the purchase order. Nor did Paragon raise any question about the escalation costs of $15,429.87 which Davis Boiler had originally submitted in its June 8, 1978 letter to Paragon, to which Paragon made express reference in its purchase order No. 875–2B.

44(b). We expressly reject Davis Boiler's proposed finding of fact No. 44 that "Paragon, at the time it issued purchase order No. 875–2(b) and thereafter, did not intend to pay Davis Boiler for the $15,-429.87 to cover escalation, but intended to defraud Davis Boiler and to induce it to provide the subject boilers on the strength of such purchase order." We expressly find that Davis Boiler's proposed finding is not supported by the weight of any credible evidence.

45. The first boiler-burner unit for the V.A. project was shipped from Davis Boiler to Paragon on June 29, 1978.

45(a). Davis Boiler billed Paragon for the first boiler-burner unit on July 5, 1978 in the sum of $33,750.00, approximately one-third the sum of Davis Boiler's $85,-818.00 Proposal 875–2A plus the sum of $15,429.87, stated in Paragon's purchase order No. 875–2B. See Defendant's Exhibit No. 100 B.

45(b). Paragon paid $33,750.00 for the first boiler-burner on July 26, 1978. Defendant's Exhibit No. 100 B.

46. The second boiler-burner unit for the V.A. project was shipped by Davis Boiler to Paragon on August 12, 1978.

46(a). Paragon paid $33,750.00 for the second boiler-burner on September 18, 1978. Defendant's Exhibit No. 100 B.

47. The last boiler-burner unit for the V.A. project was shipped from Davis Boiler to Paragon on August 17, 1978.

47(a). Paragon was billed $33,747.87 on August 18, 1978 but Paragon has not yet paid for the third boiler-burner. Defendant's Exhibit No. 100 B.

48(a). On December 7, 1978 Davis Boiler wrote Paragon a letter (Defendant's Exhibit No. 94) which stated in part:

Your Mr. Lynn Underwood advised me this morning that your company is now withholding payment of $33,747.84 on the above subject job. He advised that the test of the first unit will be December 18, 1978, and shortly thereafter you would be mailing your check to cover this amount. We are therefore enclosing our invoice covering the interest on this amount for 90 days, which is due to the terms of our Proposal and your purchase order. We appreciate your adding this interest to your payment for this unit, plus additional interest of $11.53/day for any additional days beyond December 16 through January 15, 1979.

48(b). On December 24, 1978, Paragon forwarded Davis Boiler a check in the amount of $14,571.00. Defendant's Exhibit No. 106 A.

48(c). Davis Boiler advised Fireman's on February 22, 1980 (Defendant's Exhibit No. 107 B) that a $14,571.00 check it had received from Paragon had been applied in partial payment of Paragon's open account, leaving an outstanding balance of $23,-785.32 and for the third boiler-burner which had been billed for $33,747.87 on August 18, 1978. Interest for all months except February, 1980 was included in Davis Boiler's statement of the outstanding balance.

49(a). Davis Boiler has made repeated demands to recover the amounts owed it by Paragon and Fireman's for the three boiler-burner units incorporated in the construction project.

50. Davis Boiler was not advised by Paragon that it had been placed on payment hold, but was advised by Paragon that payment would have to await government testing of the boiler-burner units.

51. By letter of March 9, 1979 Paragon requested from the V.A. a second extension

of 150 calendar days to complete the project.

52. On March 16, 1979 Paragon was granted a second extension of time by the V.A. of 150 calendar days to complete the subject project.

53. By its letter of June 1, 1979, Tom Conroy, Project Coordinator for Paragon, advised Davis Boiler that Paragon expected Davis Boiler to take the necessary action to resolve the problem of leaking tubes in one of the boilers that had been installed on the project.

54. Davis Boiler took the necessary action to resolve the problem of leaking tubes in the boiler referenced in paragraph 53 above.

55(a). The fact that Peabody Gordon-Piatt may have invoiced Paragon on January 9, 1980 for certain items required for the burners of the boilers installed on the construction project is immaterial and irrelevant to any issue in this Miller Act action.

56(a). We expressly reject Davis Boiler's proposed finding and Paragon's admission of that finding to the effect that "On or about January 16, 1980 Paragon paid Davis Boiler $14,571.00." The $14,571.00 payment was made to Davis Boiler by Paragon's check No. 10350, dated December 24, 1979, as we have found in paragraph 48(b) above.

On March 4, 1980 Tom Conroy, Project Coordinator at Paragon, transmitted a copy of an "additional punch list" for the project and indicated to Robert Jefferis of Caloric Transfers that it was imperative that the items relating to the boiler-burner units be completed so final settlement could be made.

58. A stack thermometer was shipped by Davis Boiler to Paragon for the construction project on April 16, 1980 and on April 28, 1980 Davis Boiler shipped Paragon three (3) boxes of Kaowool with studs, and fifty (50) pounds of mortar.

59(a). Davis Boiler is entitled to recover the balance due for the third boiler-burner furnished the construction project in the amount of $19,176.87, plus interest thereon, per the terms and conditions stated by Da-

vis Boiler on the reverse side of page 5 of its Proposal No. 875–2A, dated February 21, 1978.

60(a). Paragon has suffered no damages as a result of defendant's acts or omissions.

60(b). The terms and conditions set forth on the reverse side of page 5 of Davis Boiler's Proposal 875–2A were expressly incorporated into Davis Boiler's acceptance of Paragon's purchase order dated June 15, 1978, and those terms and conditions were in turn accepted by Paragon by its action in accepting delivery of all three of the boiler-burners for incorporation into the construction project.

60(c). Fireman's executed a standard form 25–A Miller Act payment bond on June 26, 1976 in connection with the prime construction contract, the condition of which was that Paragon "shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided in said contract . . . ." (Defendant's Exhibit No. 126).

### III. *Conclusions of Law*

The conclusions of law proposed by the parties are somewhat unique in that none of the parties cite any legal authority to support any of their respective proposed legal conclusions. This is not unexpected, however, for the reason that most of what the parties present as proposed conclusions of law are nothing more than proposed findings of an ultimate fact which a particular party contends the Court should find under the circumstances of this case.

The one and only relevant conclusion of law in regard to which the parties are in agreement is the conclusion proposed by Paragon which concedes that Davis Boiler's cross-claim "is based on the Miller Act," 40 U.S.C. § 270a, *et seq.,* and that the Court has jurisdiction of Davis Boiler's Miller Act claim pursuant to 28 U.S.C. § 1331.

Paragon and Fireman's proposed conclusions of law do no more than reiterate the basic position reflected by their proposed findings of fact, namely, that:

"there was no consideration for plaintiff's purchase order No. 875–2B (Ex. 54)

in the amount of $15,429.87. Defendant compelled plaintiff to prepare, issue and execute the same only through the improper exercise of economic duress and coercion in refusing to deliver the boilers and related equipment until such purchase order was obtained. Consequently such purchase order never became and is not now a binding obligation upon Paragon and is of no legal force and effect." [Paragraph 7 of Paragon and Fireman's proposed conclusions of law.]

That proposed "conclusion of law" was based on the factual argument that "the correspondence between Paragon and defendant both before the proposal (Exs. 37 and 31) and thereafter (Exs. 49, 50 and 51) evidenced a clear intent of both parties that there was no obligation to pay any escalation in the basic price unless and only to the extent the VA approved such escalation and provided the money to pay for it." [Ibid., paragraph 6.]

Davis Boiler, in paragraphs 8 and 9 of its proposed "conclusions of law" reiterates its factual arguments and proposes that this Court find and conclude that "Paragon, through its officers, employees and/or agents, never had an intention of paying defendant in accordance with the terms of the parties' contract for escalation and boiler extras as reflected in the price of such contract, but rather, intended to (and did) defraud defendant and induce defendant to ship the boilers with such extras, through false material representations reflected in the contract, to pay for such extras and for the agreed escalation, when such individuals, in fact, had no intention to pay plaintiff therefor;" and that "as a result of the fraud referenced in paragraph 8 above, Davis Boiler is entitled to recover punitive damages from Paragon in the amount of $250,000.00." We expressly reject Davis Boiler's proposed finding and proposed conclusion.

The post-trial briefs filed at the Court's request in regard to the meaning that should be given the "Subject to potential price escalations" language in Davis Boiler's Proposal No. 875–2A, dated February 21,

1978, reflect that the parties again insist upon restating their respective view of the factual circumstances. We noted in part I of this memorandum opinion that the area of disputed fact was largely eliminated by the parties' reliance on documentary evidence and that the record established that neither Paragon nor Davis Boiler had any substantial experience in the execution of a standard government contract. It may be added that Fireman's, as is sometimes typical of Miller Act sureties, paid no attention to the execution of the prime contract until it had been sued on its Miller Act bond.

Our findings of fact reflect our rejection of Davis Boiler's factual argument that Paragon intended to defraud Davis Boiler and that it never had any intention of paying Davis Boiler for all three of the boiler-burners. Our findings of fact also reject Paragon's factual argument that it was somehow wrongfully and illegally induced to accept the $15,429.87 escalated cost figure set forth in Davis Boiler's June 8, 1978 letter by its issuance of its own purchase order No. 875–2B, and that it thereafter was wrongfully induced to pay for two of the three boiler-burners in accordance with the total price set forth and established by that purchase order, when added to the price set forth in Davis Boiler's proposal No. 875–2A, dated February 27, 1978, to which it had earlier agreed. Any notion that Davis Boiler was not to be paid any escalation above the otherwise agreed price for the boiler-burners unless and only to the extent the Veterans Administration approved the escalation and provided the money to pay for it could have been based only upon Paragon's lack of understanding that Davis Boiler had absolutely no standing to present any claim to the Veterans Administration under the circumstances of this case.

The late Judge Denny of the District of Nebraska cited the applicable cases from the various Courts of Appeals in *United States v. William Clairmont, Inc.*, 341 F.Supp. 940 (D.Neb.1972). The following quotation made by Judge Denny in that case from *Warrior Constructors, Inc. v.*

*Harders, Inc.,* 387 F.2d 727, 729 (5th Cir. 1967), is equally applicable to this case:

> Since there is no contract, express or implied, between a subcontractor and the government, there is no procedure by which the claim of a subcontractor can be presented against the United States except as it may become a claim of the prime contractor. A subcontractor has no standing before the Contracting Officer or the Board of Contract Appeals, and no provision is made for the hearing of disputes between a prime contractor and a subcontractor. The remedy for a subcontractor seeking to recover for labor and materials furnished on a government contract is under the Miller Act, and it has been held that when a prime contractor has a claim for the same amounts pending under the "disputes clause" of the prime contract, a subcontractor's claim under the Miller Act is not affected. [341 F.Supp. at 943]

We have no doubt that Paragon would have liked to have had the Veterans Administration pay the amount of the escalation cost which Paragon agreed to pay Davis Boiler. We are also certain that Fireman's would have been both knowledgeable and cooperative had it been consulted in time for it to have been helpful to Paragon in its effort to secure additional funds from the Veterans Administration because of the manner in which the prime contract had been executed.

█ All of that, of course, is based on hindsight and does not alter the factual circumstances as we have found them. Those facts show beyond reasonable dispute that all uncertainty in regard to the amount of the escalated cost was eliminated by Paragon's issuance of its purchase order No. 875–2(b), dated June 15, 1978, and, most particularly, by its acceptance and payment for the first two boiler-burners in accordance with the escalated price contained therein.

Under familiar Miller Act jurisprudence, all three boiler-burners were supplied by Davis Boiler in the prosecution of the work provided in the Veterans Administration's prime contract with Paragon. The full price for those boiler-burners was not promptly paid for by Paragon and both it and its surety, Fireman's, are liable for the balance of $19,176.87 due Davis Boiler by Paragon, together with the interest provided in the terms and conditions set forth on the reverse side of page 5 of Davis Boiler's proposal No. 875–2A dated February 21, 1978.

The only remaining question relates to Davis Boiler's claim for attorney's fees in this typical Miller Act case. *F.D. Rich Co., Inc. v. United States,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), settles that question in favor of Paragon and Fireman's.

For the reasons stated it is

ORDERED (1) that in accordance with Rule 58 of the Rules of Civil Procedure the Clerk shall enter judgment in favor of Davis Boiler on its cross-claim and against Paragon and Fireman's in the amount of $19,176.87, together with interest in accordance with the terms and conditions stated on the reverse side of page 5 of Davis Boiler's proposal No. 875–2A, dated February 21, 1978. It is further

ORDERED (2) that the Clerk shall confer with counsel for the respective parties in order that the final judgment shall be in a form agreeable to counsel for all the parties.